No. 3872

Second Circuit

(Second Division)

JONES v. WYATT LUMBER CO.

(November 18, 1931. Opinion and Decree.)

James W. Jones, Jr., of Natchitoches, attorney for plaintiff, appellee.

Ponder & Ponder, of Many, attorneys for defendant, appellant.

CULPEPPER, J. Levi Jones sues the Wyatt Lumber Company to recover compensation in the sum of $8.77 per week for thirty-two weeks, beginning August 5, 1929, and for $4.87 per week at the end of

the thirty-two weeks' period and continuing, not, however, beyond two hundred sixty-eight weeks, for alleged injuries to his sixteen year old son, Lee Ellis Jones, sustained while engaged in and arising out of the employment by said company.

Defendant admits the boy was in the employ on the day and date alleged, but denies he was injured while in the course of his employment, or that the injury arose out of or was incidental to his employment. Defendant avers that Lee Ellis Jones, on the contrary, had abandoned his duties, and, in violation of strict orders not to attempt to board a moving train, he attempted to do so, and as a result he received the injuries complained of. There was judgment upon the trial of the case for plaintiff in the sum of $8.77 per week for twenty-two weeks, from which judgment defendant alone has appealed.

On August 5, 1929, and for some months prior thereto, the above-named son of plaintiff was in the employment of defendant company working in the section crew, keeping up defendant's logging railroads. Along this particular railroad there were several wooden bridges crossing small streams, and due to fire hazard it was the custom of the foreman of the section crew to have some one of his crew to pass over the track after work hours from 5 to 6 o'clock in the afternoon, behind the last train to pass over the track, in order to look for and extinguish any fire that might break out on any of the bridges or trestles caused from passing trains. The foreman, John Pope, instructed the employed boy on the afternoon of August 5, 1929, as he had done on a number of similar previous occasions, and after the day's work was over, to walk over the track to look for any fires which might have been started on any of the bridges. Lee was paid at the rate of $2.25 per day for his regular

ten hours' work on the section, ending at 5 o'clock, and 25 cents extra for the one hour he was supposed to consume thereafter in walking over the track. The length of the track he was supposed to patrol on that occasion was about one mile and a quarter. Mr. Pope, foreman, testifying as to Lee's duties, says:

"His duty was to be careful and stay out of the way of trains and after the trains came in to come in behind them and take care that there was no fire to take care of any fire that he seed along the track and bridges."

He was to walk into camp behind the last train. If he arrived at a trestle before the train passed, he was instructed particularly to "get off outside and watch until the trains passed," then walk in behind the train. He was told not to ride the train.

Isaac Courtney, a log loader coming into camp on the train which injured the boy, testified he was riding on the left-hand side of the engine and saw Lee sitting on end of a cross-tie on witness' side of the track as the train approached him; that the train was backing in to the camp, the two end cars having a load of lumber placed partly on one of the cars and partly on the other, and there being several other empty flat cars between the two loaded ones and the engine; that the load of lumber "had slacked and one end of it come off;" that "some of the lumber was hanging off from the end of the ties"; that, when the train got within about two car lengths (sixty feet) from Lee, he got up from the end of the cross-tie on which he was sitting, and made a step or two "getting in the clear"; and that Lee had gotten "clear of everything but the lumber and it caught him in his pants and it dragged him nearly across the trestle and there was a long tie and it butted him and knocked

him loose and he fell down there under the trestle."

Witness says it was a piece of the lumber which was protruding out from the car that caught Lee's pants. He says the cross-tie on which Lee was sitting was at the edge of the trestle on the side or end from which the train was approaching, and that when he was caught by the piece of lumber he was carried about two rail lengths before being knocked loose and fell. Both bones of his leg were broken between the knee and ankle. This witness, Isaac Courtney, when cross-examined, appeared not to know anything other than just the facts as stated on direct examination. Many questions were asked him about simple questions of fact connected with and surrounding the accident, but he pretended not to know anything. His lack of knowledge of facts upon cross-examination, we must say, was rather remarkable. This was the only witness who said he saw Lee as the train approached him.

Luther Horne, another employee on the train, said the first thing he saw was his heels fly up just before the boy fell from whatever it was that had hold of him. Horne's position on the train was sitting on an empty flat car back from the two loaded cars and on the side opposite from where Lee was seated on the cross-tie. Says he did not see Lee sitting on the cross-tie—did not see him at all until he saw his heels fly up. Asked about whether any pieces of lumber were protruding from the loaded cars, Horne said he did not see any. Says he does not know what caught the boy. Horne said he helped set the car out at the switch, but saw no pieces of lumber projecting over the side of the car.

Lee Ellis Jones testified that he was sitting on the track, and, when the train got pretty close to him, he got "up to walk from the track," and "just as I started off that is all I remember. Something catched me and the next thing I remember I was gettin' up from the other side of the trestle." Says he does not know what caught him, and that he did not notice any lumber sticking over the side of the car. Says it was about 5:20 o'clock that he got hurt. He says when he got off the track he stepped off on the edge of the dump. He denies that he tried to catch the train and ride in to camp.

John Pope testified that the dump along by the side of the track at the place where Lee claims he stepped off the track on to it is about eight feet wide, which is no wider than the ties are long, eight feet, just a "skeleton dump." Pope says the dump is about ten or twelve feet high, and is steep on the side Lee claims he was standing on, but on the opposite side the dump is a gradual slope.

Sam Lewis, the flagman, testified he was riding a flat car on the side of the track opposite from the side Lee said he was on, and could see the track ahead; that he saw no one, did not see Lee at all. Says he could see well, and could have seen Lee if he had been up on the track. Says he examined the car there at the place of the accident, and that there was nothing hanging over the side of the car; that the car was still loaded, chain over the lumber, and fastened, and the lumber straight.

Peyton Self was fireman on the train. He says he was up in the engine at the time and could see the track ahead, and that he did not see Lee. Says the car of lumber was loaded flush with the bunk, and that he did not see any pieces of lumber projecting over the side of the car. Says he could have seen Lee if he had

been standing on the track ahead. He was on the right-hand side of the engine cab facing the way the train was going, which was the same side the accident happened.

Clarence Gandy testified he was on the train, standing up on the running board of the loader, and was in charge of the train at the time; that he could see the track ahead of him, as the running board was about two feet above the car, and was watching the track ahead. Says he did not see Lee anywhere, neither on the track nor by the side of it; notwithstanding he says he was keeping a close watchout ahead. Says he helped load the car of lumber that afternoon at the mill, and saw it at the time of the accident, and that the lumber was loaded straight, securely fastened down with a chain, and none of it was projecting over the sides of the car.

Five-thirty o'clock in the evening the early part of August is broad daytime. It is most remarkable that none of the crew of six men on that train saw Lee Ellis Jones anywhere on or about the railroad track except the lone witness Isaac Courtney, whose memory was bad as to most everything he was asked upon cross-examination. The testimony to the effect that the lumber on the car was properly loaded, placed straight, securely fastened down, and no pieces projecting out on the sides of the car, was fully concurred in by practically all the witnesses except Isaac Courtney. Lee Ellis Jones could hardly have stepped off the track on to a dump at that particular place as he says he did, because the track covered, or practically covered, the entire dump. If he had stepped off the track, he would have been precipitated down the steep embankment some ten or twelve feet, and away from the train and away from any plank or projection that could possibly have been attached to the

car. About the only possible way the injured boy could have come in contact with the train, under the preponderance of the evidence, would have been for him to have been in hiding down under the embankment, or under the trestle which was only twelve feet away, and, when the train, which was running at a slow speed, got near him, he attempted to board it, and in doing so fell, and as a consequence was hurt. His motive for attempting such a feat is easily accounted for, in that he wished to save having to walk into camp.

Mr. Gandy testifies that he asked Lee immediately after the accident what he meant by letting the train run over him, and he replied that he did not know. If Lee had had nothing to hide as to how he got hurt, the natural thing for him to have done would have been to tell Mr. Gandy how it happened. Dr. Perkins, who treated the boy a few hours after the injury, testified that he asked him how he came to get hurt, and that Lee first told him he did not know, and then later said he tried to get on the train and fell off. We think this must have been the cause of the accident.

The boy had had strict orders to keep away from the trains as they passed him and not to get on them. We think the preponderance of the evidence shows that in violation of these strict orders the boy deliberately violated them, and thus brought about his own injury. Under such circumstances, plaintiff cannot recover under the Employers' Liability Act (Act No. 20 of 1914, as amended). Webre v. Caire & Graugnard, 10 La. App. 775, 123 So. 168; Pierre v. Barringer, 149 La. 71, 88 So. 691.

For the reasons above assigned, the judgment of the lower court is reversed; and there is now judgment rejecting plaintiff's demands, with costs of both courts to be paid by plaintiff.